**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WILLIAM D. BRYANT,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **2:14-cv-00677-TFM** |
| ) | |
| **CAROLYN W. COLVIN**, ) | |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

April 6, 2015

## I.    Introduction

William D. Bryant ("Plaintiff") brought this action, *pro se*, for judicial review of the decision of the Acting Commissioner of Social Security ("Acting Commissioner"), which denied his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403, 1381-1383(f). The Acting Commissioner has filed a motion for summary judgment, to which Plaintiff has filed a response. (ECF Nos. 7, 9). Accordingly, the Acting Commissioner's motion is ripe for adjudication, and, for the following reasons, said motion will be **GRANTED**.

## II.    Background

Plaintiff was born on September 9, 1951. (R. 39). He graduated from high school and attended one year of college. (R. 212). He has past relevant work experience as a customer service representative, construction supervisor, general laborer, and car salesman. (R. 28). However, he has not worked since March 31, 2008, when he was laid off from his customer service job. (R. 39-40). Plaintiff's date last insured ("DLI") for the purposes of DIB was March

1

31, 2010. (R. 37).[1]

## A. Procedural History

Plaintiff filed an application for DIB on June 23, 2011, and an application for SSI on June 24, 2011, in which he alleged disability as of March 31, 2008, due to degenerative disc disease, high blood pressure, heart disease, and diabetes. (R. 184-92, 211). Plaintiff's claims were denied at the administrative level. (R. 96-103). Thereafter, he filed a written request for a hearing, which was conducted on January 10, 2013, before Administrative Law Judge Guy Coster ("ALJ"). Plaintiff was represented by counsel and testified at the hearing, as did an impartial vocational expert ("VE"). (R. 37-75).

On March 6, 2013, the ALJ issued an unfavorable decision to Plaintiff. (R. 8-34). In rendering the decision, the ALJ found that prior to Plaintiff's DLI, he had the following impairments: chronic low back pain caused by degenerative disc disease of the lumbar spine, insulin dependent diabetes mellitus, hypertension, and a remote history of coronary artery disease ("C.A.D."). (R. 13-14). None of these impairments were considered to have been "severe" prior to the expiration of Plaintiff's insured status. (R. 214). As of the date Plaintiff applied for SSI, however, the ALJ found that Plaintiff's degenerative disc disease, diabetes, and high blood pressure had become "severe." (R. 17). Nevertheless, the ALJ found that Plaintiff retained the RFC to perform sedentary work,[2] with the following additional limitations: "he

---

1.  A plaintiff's "date last insured [("DLI")] is based on the number of sufficient quarters of coverage that a plaintiff acquires to remain insured under the Act." *Hyler v. Colvin*, No. CIV.A. 12-4974, 2013 WL 3766817, at *9 (E.D. Pa. July 18, 2013). When a plaintiff files his application after his insured status has expired, he must establish that he became disabled prior to his DLI in order to recover disability insurance benefits. *Id.* Accordingly, the relevant time period for Plaintiff's DIB claim began on his alleged onset date of March 31, 2008, and ended on his DLI, March 31, 2010.

2.   "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools." 20 CFR § 404.1567. As the

should avoid concentrated exposure to temperature extremes and humidity," "concentrated exposure to dust and fumes, or poor ventilation," and he can only occasionally perform postural activities. (R. 17-18). Then, based on the VE's testimony, the ALJ concluded that, despite his impairments, Plaintiff could perform the requirements of his past relevant work as a customer service representative. (R. 28). Therefore, the ALJ held, Plaintiff is not disabled under the Act. (R. 29).

The ALJ's decision became the final decision of the Acting Commissioner on March 20, 2014, when the Appeals Council denied Plaintiff's request for review. (R. 1-5). On May 23, 2014, Plaintiff filed a motion to proceed *in forma pauperis*, which the Court granted. (ECF Nos. 1-2). Thereafter, his Complaint was filed. (ECF No. 3). The Acting Commissioner's motion for summary judgment, accompanied by a brief in support, then followed. (ECF Nos. 7-8).

## B.      Medical Evidence

Plaintiff has a number of chronic medical conditions, including diabetes, C.A.D., hypertension, and dyslipidemia, for which he has been receiving treatment for some time. At a height of 6'2" and more than 250 pounds, he is also considered obese. His chief complaint, however, is that his lower back pain prevents him from working. He began to experience back pain in 2004 and it has progressively worsened.

Treatment records from August 2004 through January 2006 document, at various times, complaints of low back pain, which was treated with Tylenol. (R. 546, 548). The Tylenol reportedly helped somewhat. (R. 558). Plaintiff was also referred to physical therapy ("PT")

---

name indicates, these types of jobs require sitting, but "a certain amount of walking and standing is often necessary in carrying out job duties." *Id.* More specifically, "[a] sedentary job should require no more than approximately 2 hours of standing or walking per eight-hour work day, and sitting should typically amount to six hours per eight-hour work day." *Mason v. Shalala*, 994 F.2d 1058, 1068 (3d Cir. 1993) (citation omitted).

during this time period, but it is unclear whether he ever actually received such treatment. Issues regarding his insurance coverage appear to have prevented him from doing so. (R. 563). X-rays from early 2006 reflected L4-L5 spondylolisthesis. (R. 563). At the time, however, Plaintiff's doctor noted that Tylenol was effectively working for him, and he was advised to continue taking it. (R. 563).

There is relatively little medical evidence in the record during the period from March 31, 2008, through March 31, 2010, which is the relevant time period for DIB. A treatment note from Allegheny Internal Medicine dated March 31, 2008, indicated that Plaintiff's diabetes was uncontrolled, but his hypertension was "at goal." (R. 278). He was noted to be on statin for his C.A.D. (R. 278). It was further noted that Plaintiff had been non-compliant with several of his medications, largely because he was unable to afford to fill his prescriptions for them. (R. 281).

In August 2009, Plaintiff appeared at Allegheny General Internal Medicine to re-establish care. (R. 278). The doctor noted that Plaintiff had been laid off from his job at DirectTV in March 2008 and that his prescriptions had expired. (R. 278). Plaintiff was apparently using a deceased relative's diabetes medication because financial issues affected his capability to refill his prescriptions. (R. 278).

The next treatment records are from July and October 2010. (R. 273-276). In July, it was noted that Plaintiff's diabetes was uncontrolled, but his hypertension was near goal. (R. 275). During this visit, Plaintiff was given a medical assistance form to help him obtain his medications. (R. 275-76). In October, Plaintiff's diabetes was still considered uncontrolled, and he continued to have difficulty obtaining his medications. (R. 274). In addition, he complained of lower back pain, which his doctor said was "most likely [a] muscle spasm," and shoulder pain, which was thought to be secondary to an old rotator cuff tear. (R. 274).

Also in October 2010, Plaintiff was seen by Dean Sotereanos, M.D., of Allegheny General Hospital, who reported that Plaintiff was "an old patient with a new problem" – specifically, left shoulder pain – "who was last [seen] back in 2004." (R. 284). On examination, he showed full active and passive range of motion, but he had pain over the acromioclavicular joint and with cross arm adduction maneuver. (R. 284). Dr. Sotereanos' diagnosis was left shoulder impingement syndrome, along with acromioclavicular joint osteoarthritis. (R. 284). He recommended conservative treatment of these conditions. (R. 284).

In January 2011, Plaintiff began seeing a new primary care physician ("PCP"), Gopinath Rajupet, M.D. (R. 499). Dr. Rajupet's notes reflect that Plaintiff had been diagnosed with diabetes "more than 15 years ago." (R. 499). Dr. Rajupet also noted that Plaintiff had a history of hypertension, hyperlipidemia, and C.A.D. (R. 499). Furthermore, it was noted that Plaintiff had undergone rotator cuff surgery some years in the past. (R. 500). Plaintiff complained of some tingling in his feet but denied having any sores or swelling. (R. 499). He also complained of back pain, accompanied by stiffness in the morning. (R. 499). He described having to stretch before being able to move, and noted that the pain sometimes radiated to his legs. (R. 499). However, he denied having any weakness in his legs. (R. 499). Upon examination, Plaintiff's range of motion in his back was slightly limited. (R. 500). At the conclusion of the office visit, Dr. Rajupet ordered that Plaintiff undergo back x-rays. (R. 500).

Plaintiff returned to Dr. Rajupet the next month for a follow-up and to review his x-rays, which showed some osteoarthritis. (R. 495). He still complained of back pain. (R. 496). When examined, Plaintiff displayed a limited range of motion in his back (R. 496). Due to Plaintiff's continued complaints, Dr. Rajupet referred him to an orthopedist for a second opinion. (R. 496).

Plaintiff met with orthopedist, Jeffrey Baum, M.D., on March 2, 2011, who reported that

Plaintiff had been experiencing back pain for several years and had undergone therapy and taken several different non-steroidal medications, but to no apparent avail. (R. 309). Dr. Baum also reviewed Plaintiff's recent x-rays and confirmed that they showed moderate degenerative changes in the lower lumbar spine. (R. 309). Dr. Baum observed, however, that Plaintiff walked around the room "pretty easily." (R. 309). With respect to Plaintiff's range of motion, Dr. Baum noted that he exhibited some moderate spasm with forward flexion, but that his "[e]xtension [was] not too bad" and "[h]e ha[d] no tension signs out to 90 degrees." (R. 309). In Dr. Baum's view, Plaintiff also had "good quadriceps, dorsiflexion, and plantar flexion strength." (R. 309).

Following his initial visit with Dr. Baum, Plaintiff underwent an MRI, which showed degenerative disc disease, worse at L3-4 and L5-S1, but with no evidence of stenosis, disc herniation, or foraminal changes. (R. 308). Upon review of Plaintiff's MRI, Dr. Baum told Plaintiff that he was not a candidate for surgery. (R. 308). Dr. Baum instead recommended that Plaintiff see a chiropractor. (R. 308).

Plaintiff followed up with Dr. Rajupet on March 31, 2011. (R. 492). After reviewing the results of Plaintiff's recent MRI and examining Plaintiff, Dr. Rajupet recommended that Plaintiff do back exercises to strengthen his muscles and also encouraged him to follow-up with Dr. Baum.

Dr. Rajupet next saw Plaintiff in July 2011, when he "had some disability papers" for Dr. Rajupet to complete. (R. 488). Dr. Rajupet noted that Plaintiff was still complaining of back pain, which, in Plaintiff's view, prevented him from doing "multiple jobs." (R. 488). Plaintiff described having increased pain with "[p]rolonged sitting, standing, or even walking and bending." (R. 488). Plaintiff said that his pain limited his ability to move his back. (R. 488). During his visit, Dr. Rajupet completed a Medical Source Statement ("MSS") in which he opined

that Plaintiff could occasionally lift/carry 20 pounds; stand/walk one hour or less during a workday; sit less than six hours in a workday (though he did not specify how many hours); and occasionally perform all postural activities except for climbing. (R. 311-12). In addition, Dr. Rajupet, without comment, checked boxes indicating that Plaintiff's ability to reach, handle, finger, feel, see, hear, speak, and taste/smell, as well as his continence, were affected by his impairments. (R. 312). He also opined that Plaintiff could not work in a number of environmental conditions. (R. 312).

On September 7, 2011, Plaintiff underwent an examination with the state consultative examiner, Angelo Constantino, M.D. (R. 327). Based on his examination and review of the records, Dr. Constantino opined that Plaintiff could frequently lift/carry 20 pounds and occasionally 25 pounds. (R. 328). Moreover, Dr. Constantino found that Plaintiff was unlimited with respect to standing/walking; could sit for eight hours with a sit/stand option; was unlimited in his ability to push/pull; had no limitations in postural activities or other physical functions such as reaching, handling, etc.; and required no environmental restrictions. (R. 329).

Plaintiff returned to Dr. Rajupet in October 2011 and reported that he had gained weight and that his back was still bothering him, making it difficult for him to work out. (R. 354). On examination, Plaintiff again displayed a somewhat limited range of motion. (R. 354).

Upon referral from Dr. Rajupet, Plaintiff commenced PT at Health Star Physical Therapy on November 18, 2011. (R. 457). During the intake interview, he reported to the therapist that he had been suffering from worsening back pain for about five years, which he rated at 8/10. (R. 457). Plaintiff stated that he was unable to stand, walk, or sit for long periods of time due to the back pain. (R. 457). He also explained that he frequently woke up in the middle of the night because of the pain. (R. 457). According to the therapist's notes, Plaintiff displayed a somewhat

limited range of motion in his back, but in all other areas except bilateral hip flexion, he was within normal limits. (R. 458). The therapist noted that Plaintiff's potential for rehab was good. (R. 459).

Plaintiff followed up with Dr. Rajupet on November 23, 2011, to get additional disability paperwork completed. (R. 481). Plaintiff reported that despite his PT, he still felt pain in his back. (R. 481). He told Dr. Rajupet that he was not able to sit for more than one to two hours; had trouble lifting more than 10 pounds; had trouble standing; and had trouble looking at a computer screen and sitting in a chair for a prolonged period of time. (R. 481). Dr. Rajupet observed Plaintiff's limited range of motion in his back and assessed him with having radiculopathy, secondary to osteoarthritis of the back and desiccated discs. (R. 481). Following this visit, Dr. Rajupet completed another MSS, in which he opined that Plaintiff could sit for only 0-2 hours, stand/walk for 0-2 hours, and occasionally carry less than 10 pounds. (R. 464). In addition, Dr. Rajupet opined that Plaintiff had significant limitations in reaching, handling, fingering, and lifting; could not keep his neck in a constant position; had to avoid all postural activities; could not push/pull; and had several environmental restrictions. (R. 465). Dr. Rajupet further opined that Plaintiff was incapable of performing low stress work, was "unable to perform any activity due to back pain," and would miss more than three days of work per month due to his impairments. (R. 466, 467).

Plaintiff continued to undergo PT at Health Star from November 2011 through February 2012. In a progress letter from his therapist to Dr. Rajupet dated January 27, 2012, the therapist reported that Plaintiff had been feeling more flexible since he started PT. (R. 448). He also felt less pain and was building a tolerance to standing and walking. (R. 448). He reported using Extra Strength Tylenol to manage his pain and occasionally using ice. (R. 448). Objectively, the

therapist wrote that Plaintiff walked with "increased gait velocity as compared to [his] initial evaluation." (R. 448). She also wrote that Plaintiff had demonstrated "slow but positive response to physical therapy." (R. 449). In particular, he had achieved the following goals: (1) decreased pain, (2) increased lumbar spine and hip range of motion, and (3) increased strength in his back without increased pain. (R. 449). The therapist also remarked that Plaintiff could perform all activities of daily living with minimal difficulty and could tolerate aerobic conditions for 10-15 minutes without increased pain. (R. 449). Based on Plaintiff's progress, the therapist recommended that he continue with PT for an additional four weeks, in hopes of further decreasing his pain and improving his mobility. (R. 449).

In May 2012, Plaintiff met with cardiologist, John Power, M.D., who noted that Plaintiff had a history of C.A.D. and had a stent implanted in 2001. (R. 593). Plaintiff reported having experienced occasional chest pain about once per month, but he did not experience any associated shortness of breath, nausea, vomiting, or diaphoresis (i.e. profuse sweating). (R. 593). Dr. Power assessed Plaintiff as having C.A.D., New York Heart Association class II with a history of diabetes; hypertension, which was reportedly under good control; and lipid disorder. (R. 594).

Later that month, Plaintiff returned to Dr. Rajupet's office for a check-up. (R. 474). He presented with complaints of left knee pain, as well as nasal congestion. (R. 473). He also reported that his blood sugar levels were running high, as he was having trouble with his diet and often missed taking his diabetes medications. (R. 473). Upon examination, Plaintiff displayed normal spine range of motion, intact muscle strength, normal motor and sensory functions, and normal gait and station. (R. 474). Dr. Rajupet attributed Plaintiff's knee pain to patellofemoral syndrome and suggested that Plaintiff start doing knee exercises. (R. 474). He also noted that

Plaintiff's diabetes was poorly controlled and instructed him to get new blood work done. (R. 474). Dr. Rajupet concluded by noting that Plaintiff's back pain was stable and advised Plaintiff to continue taking his medications. (R. 474).

Plaintiff had a follow-up with Dr. Rajupet in July 2012. (R. 468). His back pain persisted, but he reported that he was learning to live with it. (R. 468). Dr. Rajupet's examination revealed that Plaintiff's spine range of motion was again normal and his muscular strength was again intact. (R. 469). It was recommended that he continue with his stretching exercises and taking his anti-inflammatory medications to manage the pain. (R. 469).

Plaintiff had a second appointment with Dr. Baum on August 8, 2012. (R. 564). In his treatment notes, Dr. Baum remarked that he last saw Plaintiff in March 2011, at which time an MRI scan revealed some degenerative disc disease. (R. 564). Dr. Baum noted that Plaintiff had been receiving PT for approximately six months, and it was helping to strengthen his back. (R. 564). Plaintiff reported, however, that he was experiencing increased pain in his back and his right buttocks. (R. 564). Dr. Baum's x-rays of Plaintiff's lumbar spine showed that he was starting to develop a slight degenerative spondylo at L4-L5. (R. 564). He also ordered Plaintiff to undergo a new MRI scan and prescribed him the pain reliever Ultram. (R. 564).

Plaintiff returned to Dr. Baum's office at the end of August 2012 to review the results of his MRI. (R. 578). The MRI revealed some degenerative changes and foraminal narrowing on the rihgt side of Plaintiff's spine at L4-L5, as well as degenerative disc disease. (R. 585). On examination, Plaintiff displayed no weakness in his legs and was fully ambulatory. (R. 585). Dr. Baum also noted, however, that Plaintiff had been experiencing left anterior knee pain, and recommended that he start doing PT to manage the pain. (R. 586).

On October 12, 2012, Plaintiff had another follow-up with Dr. Baum. (R. 578). He

reported that his symptoms were about the same as they were during his last visit in August. (R. 578). He also explained that his PT was helping much. (R. 578). Upon examination, however, Plaintiff was fully ambulatory, displayed only moderate spasm in his back, had no tension signs, and exhibited good strength. (R. 579). Dr. Baum explained that Plaintiff's options were to go to a pain clinic for injections into his degenerative spondylo, consider epidural steroidal injections, continue PT, or to get an inversion table. (R. 579). Dr. Baum advised Plaintiff against surgery, though, noting that every other possible treatment should be exhausted first because of Plaintiff's other health issues. (R. 579).

Two months later, on December 11, 2012, Plaintiff reported back to Dr. Baum that he did not want to receive injections because of his diabetes and that he did not think PT had helped. (R. 572). After examining Plaintiff, Dr. Baum observed that both his dorsiflexors and plantar flexors were weak. (R. 571). Since Plaintiff indicated his unwillingness to receive injections, Dr. Baum decided to discuss surgery with him. (R. 572). Plaintiff told Dr. Baum that he would consult with his PCP to decide whether he would go that route. (R. 572).

Plaintiff went to the emergency room on December 25, 2012. (R. 603). He had fallen three days before and slid down two steps on his tailbone. (R. 603). He was apparently told that he had two cracks in his tailbone.

In early January, two days before his hearing, Plaintiff returned to Dr. Baum's office, again complaining of back pain. (R. 565). Plaintiff said that he was having difficulties with his back and right leg, but he did not want to have surgery because his wife was receiving chemotherapy. (R. 565). Dr. Baum reviewed the x-rays from Plaintiff's emergency room visit and determined that, contrary to what Plaintiff had been told, he did not believe that tailbone was truly fractured. (R. 565). Dr. Baum concluded by noting that Plaintiff's "major issue is that he

has not been working for several years." (R. 565). He continued: "I think based upon his back, I think it would be extremely difficult for him to work full-time gainfully employed. I told him from my standpoint, I do not think he could work full-time 40 hours a week 5 days a week to be gainfully employed based upon his back." (R. 565).

The next week, Plaintiff underwent a disability evaluation with Dr. Rajupet, who noted that he had been experiencing increased back pain and difficulty walking and standing for long periods of time. (R. 640). Plaintiff complained also of difficulty sitting because of the increased pain and difficulty sleeping at night. (R. 640). He also described having trouble pushing/pulling, lifting anything more than 10 pounds, bending, kneeling, and engaging in activities of daily living because of the pain. (R. 640). In addition, having to care for his wife, who was stricken with cancer, caused him additional anxiety and stress. (R. 640). Following his visit with Plaintiff, Dr. Rajupet drafted a letter "[t]o whom it may concern," in which he opined that Plaintiff "has multiple medical problems" and "in view of his multiple medical problems presently increased back pain leg pain associated anxiety and depression and poorly controlled diabetes with diabetic neuropathy he is totally disabled and unable to maintain full-time or part-time job." (R. 639).

On February 5, 2013, Dr. Baum drafted a letter to the SSA on Plaintiff's behalf, in which he explained that Plaintiff "has had progression of a degenerative process in his back and now has a fair amount of spinal stenosis and a spondylolisthesis at L4-5." (R. 638). As Dr. Baum explained, this caused Plaintiff's back and "radicular right leg pain." (R. 638). As a result, he concluded, "[i]n his present condition, it is my opinion based on the progression of his degenerative disease, that he cannot be gainfully employed working full time, 40 hours a week/5 days a week . . . ." (R. 638).

### III. Legal Analysis

#### A. Sequential Evaluation Process

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. § 423 (d)(1). When resolving the issue of whether an adult claimant is disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C. § 404.1520; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

#### B. Standard of Review

The Act strictly limits this Court's power to review the Commissioner's final decision. 42 U.S.C. §§ 405(g)/1383(c)(3). "This Court neither undertakes a de novo review of the decision, nor does it re-weigh the evidence in the record." *Thomas v. Massanari*, 28 F. App'x 146, 147 (3d Cir. 2002). Instead, this Court's "review of the Commissioner's final decision is limited to determining whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). If the Commissioner's decision is supported by substantial evidence, it is conclusive and must be affirmed. 42 U.S.C. § 405(g). The United States Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971). It

consists of more than a scintilla of evidence but less than a preponderance of the evidence. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798 (3d Cir. 2010). Importantly, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009)

### C. Discussion

The Acting Commissioner moves for summary judgment, arguing that the ALJ's decision is supported by substantial evidence. Plaintiff has responded to the Acting Commissioner's motion with the following two-paragraph submission:

> I hereby request that the court does not grant dismissal in this case. I respectfully ask that I be given a fair hearing in this case because I am one person against the massive, and well resourced bureaucracy of the Social Security Administration, and at a seemingly overwhelming disadvantage. The law and the promise of Social Security is that If [sic] we, after paying in to the system, are rendered unable to physically maintain full time employment, we are entitled to our benefits. In my case I have discs in my lower back, which are drying up and shrinking. It has been contended that I retroactively filed on June 24, 2011 for the date of March 31, 2008. This is not the facts. When asked in the fall of 2011 by an agent out of the McKeesport Pa. SSA office over the phone, if I was filing from March 2008, I clearly told her no. I explained to her that I was filing from the date of my initial application. It seems that it is automatically assumed within the application system that ones [sic] last day at a job is the first day you are filing for. In my case I looked for work after my last job ended until my physical condition became too severe to tolerate any longer.

> There are conclusions and determinations stated in the Social Security Administration's case, which do not bear out against the facts of my medical condition. These discrepancies must be challenged against the actual records of this case.

> Documentation is attached.

Pls.' Resp. in Opp. at 1, ECF No. 9. As exhibits to his response, Plaintiff has attached the letters of Dr. Rajupet and Dr. Baum, in which each opined that Plaintiff was unable to work. The progress notes from Plaintiff's January 15, 2013, evaluation with Dr. Rajupet and Dr. Rajupet's

November 2011 MSS have also been attached as exhibits.[3]

Because Plaintiff is representing himself in this matter, the Court is obligated to liberally construe his filings and "apply the applicable law, irrespective of whether [he] has mentioned it by name." *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002) (citing *Holley v. Dep't of Veteran Affairs*, 165 F.3d 244, 247–48 (3d Cir. 1999)). Having liberally construed Plaintiff's response to the Acting Commissioner's motion, the Court interprets said response as an attack on the ALJ's decision not to fully adopt the opinions of Plaintiff's treating doctors.[4] That is to say, Plaintiff seems to think that the ALJ was required to find him disabled because his doctors stated in the attached letters that he could not work due to his impairments. That is not actually the case, however.

It is well established that "a statement by a plaintiff's treating physician supporting an assertion that [he] is 'disabled' or 'unable to work' is not dispositive . . . ." *Adorno v. Shalala*, 40 F.3d 43, 47-48 (3d Cir. 1994) (citing *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990)). In other words, just because a doctor tells a plaintiff that he cannot work does not mean that he is disabled as that term is defined by the Social Security Act. *See* Social Security Ruling ("SSR") 96-5P at *5 (S.S.A. July 2, 1996). Rather, the term disabled has a special meaning under the Act, and it is solely up to the ALJ to decide whether a person falls within that definition by applying the applicable standards and regulations. *Id.* Thus, while the Court recognizes that both Drs. Rajupet and Baum opined in their respective letters that Plaintiff was unable to work, their

---

3. The Court notes that each of the attached exhibits was part of the administrative record that was before the ALJ whenever he rendered his decision. (R. 638-42).

4. The Court also recognizes that Plaintiff believes his alleged onset date was erroneously listed as March 31, 2008. However, for the purposes of DIB, Plaintiff was *required* to establish that he was disabled before his insured status ran out on March 31, 2010. If, as he explains in his filing, he did not actually become disabled until his filing date – which was after his insured status expired – then he would in effect be conceding that he was not eligible for DIB.

statements were not "entitled to controlling weight" or even required to be "given special significance" by the ALJ. *Id.*

Of course, these opinions could not simply be ignored. Under the applicable regulations, the ALJ was required "to review all the medical findings and other evidence presented in support of" them. *Adorno*, 40 F.3d at 48. Then, he had to "weigh the relative worth of" these opinions "against the reports submitted by other physicians who have examined the claimant," including the state consultative examiner, and all of the other evidence in the case record. *Id.* If the ALJ concluded that the opinions of Plaintiff's doctors were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in the case record," the ALJ was free to reject them, as long as he sufficiently explained his reasons for doing so. *Fargnoli*, 247 F.3d at 42.

The ALJ fully complied with these requirements. He thoroughly reviewed the opinions of each doctor, as set forth in their respective letters and elsewhere in the record, weighed them against the evidence as a whole, and fully explained his reasons for rejecting portions of them.

First, the ALJ appropriately considered the two medical source statements completed by Dr. Rajupet. As the Social Security Administration has explained, "[m]edical source statements are medical opinions submitted by acceptable medical sources . . . about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." SSR 96-5P at *5. "Although an [ALJ] may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the RFC assessment." *Id.* Instead, the ALJ "must weigh medical source statements under the rules set out in 20 CFR 404.1527 and 416.927, providing appropriate explanations for accepting or rejecting

such opinions." *Id.* In this case, the ALJ did just that. As he noted, Dr. Rajupet's two check-box form reports were "weak evidence at best" inasmuch as they were "unaccompanied by thorough, written reports . . . ." *Mason*, 994 F.2d at 1064 (internal citations and quotation marks omitted). As the ALJ also pointed out, Dr. Rajupet's own treatment records failed to substantiate his opinions about the extent of Plaintiff's impairments. Instead, in his two MSS forms, Dr. Rajupet seemingly adopted, without scrutiny, Plaintiff's own subjective complaints about his conditions, which undermined the amount of weight to which Dr. Rajupet's opinions were entitled. In addition, although the forms were completed just two months apart, they were somewhat in tension with each other, and Dr. Rajupet failed to offer any explanation why he believed Plaintiff was more limited in November than he was in July.

Second, the ALJ appropriately considered Dr. Baum's opinion that Plaintiff could not work. (R. 26). This type of conclusory opinion, as the ALJ found, was not entitled to controlling weight since it touched upon an issue reserved for the ALJ. Thus, the ALJ was within his authority to reject it in favor of the other substantial evidence in the record suggesting that Plaintiff was not as impaired as Dr. Baum opined. In sum, therefore, the Court finds that the ALJ did not err in deciding not to fully adopt the opinions of Plaintiff's treating doctors.

In addition to having considered Plaintiff's argument with respect to the ALJ's treatment of his treating doctor's opinions, the Court has reviewed the entire record in this case to determine whether the ALJ's residual functional capacity assessment and, in turn, his decision that Plaintiff is not disabled is supported by substantial evidence. Having done so, the Court concludes that substantial evidence does, in fact, support the ALJ's decision.

The term "residual functional capacity" is defined as "the most [a plaintiff] can still do despite [] limitations." 20 C.F.R. § 416.945(a). It must be assessed "based upon consideration of

all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the [ALJ] determine the most reasonable findings in light of all the evidence." SSR 96-5P at *5.

While Plaintiff no doubt suffers from a number of impairments, the ALJ was well within his discretion in analyzing all of the evidence in the record and determining that Plaintiff could perform the requirements of sedentary work with some additional postural and environmental restrictions. None of this is meant to suggest that Plaintiff is not impaired. But by limiting him to sedentary work, with additional limitations on his ability to engage in postural activities and work in certain environmental conditions, the ALJ accounted for all of Plaintiff's credibly established limitations. As the ALJ discussed in his opinion, the finding that he could perform sedentary work was consistent with Plaintiff's own testimony that he could only lift 10 pounds. His finding with respect to Plaintiff's ability to perform postural activities only occasionally was consistent with the findings of the state agency physician. And his finding with respect to Plaintiff's need to avoid several environmental factors was consistent with Plaintiff's testimony that he needed to avoid temperature and wetness extremes because such factors made his back pain worse.

The ALJ also appropriately considered Plaintiff's subjective complaints of pain in assessing his RFC. When considering a claimant's subjective complaints, the regulations require the ALJ "to ascertain whether a claimant has a medically determinable impairment that could reasonably cause the subjective symptoms alleged and then to 'determine the extent to which a claimant is accurately stating the degree of pain [or other symptoms] or the extent to which he or

she is disabled by it.'" *Malloy*, 306 F. App'x at 765 (quoting *Hartranft*, 181 F.3d at 362). In this case, the ALJ acknowledged that Plaintiff suffered pain and that pain is subjective, but found, for legally sufficient reasons, that the objective medical evidence did not support a finding that Plaintiff's pain was disabling. Again, as the ALJ pointed out, Plaintiff received relatively conservative treatment throughout the relevant time period, managing his pain by and large with Extra Strength Tylenol until Dr. Baum prescribed Ultram in August 2012. During his regular check-ups, Plaintiff routinely exhibited nearly full or only somewhat limited range of motion and full strength in his back and lower extremities, and there was minimal evidence related to his shoulder pain. His heart conditions were largely controlled by medication and resulted in only slight limitations. Likewise, there was a shortage of evidence to suggest that his diabetes was disabling. Moreover, the records from his PT indicate that therapy helped to improve his strength and decrease his pain. Plaintiff was also able to perform tasks around his house, care for himself, and assist in the care of his wife when she was undergoing chemotherapy. Credibility determinations of this sort are within the province of the ALJ and cannot be disturbed by this Court. *Van Horn v. Shweiker*, 717 F.2d 871, 873 (3d Cir. 1983).

Finally, the Court concludes that the ALJ did not err in finding that Plaintiff could return to his past relevant work as a customer service representative. "An individual retains the capacity to perform [his] past relevant work when [he] can perform the functional demands and duties of the job as [he] actually performed it or as generally required by employers in the national economy." *Malloy*, 306 F. App'x at 765 (citation omiited). The VE testified that this job was performed at the sedentary exertional level, and confirmed that his testimony was consistent with the information contained in the Dictionary of Occupational Titles ("DOT"). *See Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002) (explaining that the ALJ is required to "ask the

vocation expert whether any possible conflict exists between the vocational expert's testimony and the DOT"). When asked whether a hypothetical claimant with Plaintiff's RFC could perform the requirements of his past relevant work, the VE answered affirmatively. Since the ALJ's hypothetical question reflected all of Plaintiff's credibility established impairments, the VE's response to the ALJ's hypothetical question constitutes substantial evidence. *Rutherford*, 399 F.3d 546, 554 (3d Cir. 2005); *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). Thus, for all the foregoing reasons, the ALJ's decision will be affirmed.

## IV.    Conclusion

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges that he faces in seeking gainful employment. Under the applicable standard of review and the state of the record, however, the Court must defer to the findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Social Security Act. Defendant's motion for summary judgment will, therefore, be **GRANTED**. An appropriate order follows.

McVerry, S.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

WILLIAM D. BRYANT,                                    )
               **Plaintiff,**    )
                              )
           **v.**    )  **2:14-cv-00677-TFM**
                              )
CAROLYN W. COLVIN,                                     )
ACTING COMMISSIONER OF                          )
SOCIAL SECURITY,                                            )
               **Defendant.**    )

<u>ORDER</u>

**AND NOW**, this 6th day of April, 2015, in accordance with the foregoing Memorandum

Opinion, it is hereby **ORDERED**, **ADJUDGED, and DECREED** that DEFENDANT'S

MOTION FOR SUMMARY JUDGMENT (ECF No. 7) is hereby **GRANTED**. The Clerk shall

mark this case **CLOSED**.

                                             BY THE COURT:

                                             <u>s/ Terrence F. McVerry</u>
                                             Senior United States District Judge

cc:    **William D. Bryant,** *pro se*
        7864 Mount Carmel Road
        Verona, PA 15147
        412-867-6121

        (via First Class and Certified U.S. Mail)

        **Paul Kovac, Esq.**
        Email: paul.kovac@usdoj.gov

        (via CM/ECF)